## UNITED DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| RICK D. KAMPER o/b/o J.L. Kamper, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV0302 JCH/AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that J.L. Kamper ("Plaintiff"), now deceased, was not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff, who was born on February 22, 1963, filed for disability benefits on May 8, 2007, at the age of 44, claiming a disability onset date of January 2, 2004, due to seizures, anxiety, depression, obsessive compulsive disorder, insomnia, restless leg syndrome, and problems with her back and left foot. (Tr. 112-14.) After her application was denied at the initial administrative level, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"). Plaintiff died on September 11, 2007, due to hypoxic and ischemic encephalopathy and acute renal failure. (Tr. 69.) Plaintiff's husband ("Mr. Kamper") filed a substitution-of-party form with the Social Security Administration ("SSA") and testified at the hearing before the ALJ on May 12, 2008. A vocational expert ("VE") also testified.

The ALJ found that Plaintiff was disabled when her substance addiction disorders were considered, but that when they were not considered, Plaintiff had the residual functional capacity ("RFC") to perform sedentary jobs that were limited to simple repetitive tasks and instructions. Based upon the VE's testimony identifying jobs that an individual with Plaintiff's vocational profile and RFC could perform, the ALJ found that Plaintiff was not disabled. Plaintiff's request for review was denied by the Appeals Council of the Social Security Administration on December 29, 2008. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that (1) the ALJ erred in finding that Plaintiff's substance abuse addiction was a contributing factor material to the determination of disability; (2) the VE's testimony was unreliable because it was based upon a faulty hypothetical question posed by the ALJ; and (3) the jobs identified by the VE as ones that a person with Plaintiff's residual functional capacity ("RFC") and vocational factors could perform were not limited to simple repetitive tasks and instructions, a limitation that was part of Plaintiff's RFC as assessed by the ALJ.

<u>**Work History and Application Form**</u>

Plaintiff reported on her application form that from 1994 to 2004, she worked part-time (three hours per day, two days per week), earning $7.25 per hour as a cashier and salesperson in retail stores. From 2001 to January 2004, she also worked as a "recovery person" in the back of the store, putting merchandise into baskets. (Tr. 115.) Plaintiff's earnings records for 1978 through 2004 show minimal or no earnings in most years, with the only years that Plaintiff earned as much as approximately $10,000 being 1995, 1997, and 2002. (Tr. 100.)

Plaintiff represented on her application forms that she could not drive because of her seizure condition and could not stand for longer than ten minutes at a time due to back pain. Plaintiff wrote that her condition began to interfere with her ability to work in 2001. (Tr. 114.) On a function report submitted with her application for benefits, Plaintiff wrote that she tried to do household chores but needed to sit down after ten to 15 minutes because of back pain as well as her fear of passing out from a seizure. With the help of her husband and son, Plaintiff was able to care for pets and do laundry. For meals, Plaintiff prepared mostly sandwiches and frozen dinners; she would cook a full meal once a month. She wrote that she had no problem with personal care, and went outside only once or twice a month, but due to her fear of having a seizure, did not go out alone. Plaintiff wrote that she went grocery shopping across the street from her home, and spent her time watching TV, reading, and talking with others. She was able to walk 100 yards before having to rest; could pay attention for two to five minutes before she

would "drift away"; was able to follow written, but not spoken, instructions; got along with authority figures; and did not handle stress well. (Tr. 131-37.) At the end of Plaintiff's function report, her husband wrote that before her seizure condition began, she had a job and was active, but afterwards, had been less able to do household chores and participate in social activities. (Tr. 138.)[1]

The SSA interviewer who helped Plaintiff complete her application observed that Plaintiff was a little stiff after she got up at the end of the interview and that she walked "rather slowly." The interviewer stated further that Plaintiff had a black eye which she said was a result of her last seizure, on May 5, 2007. (Tr. 111).

**Medical Record**

On June 21, 2005, Plaintiff was admitted to the hospital after having a seizure. The discharge report stated that Plaintiff had a history of seizures since January 2002, when she fell at work with a loss of consciousness, shaking, and no memory of the event. Plaintiff was unsure of how often she had such episodes of decreased consciousness and confusion. The report also noted a history of depression and that Plaintiff complained of having migraine headaches six to ten times a day, with nausea and vomiting. The results of an electroencephalogram ("ECG") were inconclusive because Plaintiff had no clinical events during the monitoring. Plaintiff was discharged in stable condition on June 26,

---

[1]    It appears from the handwriting on the forms that Plaintiff's husband assisted her in filling them out.

2005, with a diagnosis of a seizure disorder, and prescriptions for Paxil and Remeron (anti-depressants), Klonopin and Valium (anti-anxiety benzodiazepines), and Topamax (an anti-seizure medication).  (Tr. 153-54.)

On August 19, 2005, while Plaintiff was seeing her neurologist concerning seizures, she expressed homicidal ideation toward her husband and was taken to the emergency room ("ER") by security.  A history of several past hospital admissions for depression, suicidal ideation, and homicidal ideation toward her husband was noted. Plaintiff reported daily marijuana use, but denied ongoing use of illicit drugs or alcohol. She was diagnosed with depression, a history of alcohol dependence in remission, a history of cocaine dependence in remission, marijuana abuse, and a Global Assessment of Functioning ("GAF") of 50.[2]  Plaintiff calmed down and was discharged in stable condition with directions to follow-up at a psychiatric clinic.  (Tr. 162-73.)

An outpatient psychiatry intake assessment dated August 26, 2005, and prepared by Scott Filippino, M.D., reported that the incident leading to the ER visit "occurred in the context of significant substance withdrawal."  Plaintiff had been abusing numerous

---

[2]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

illicit drugs, as well as prescription benzodiazepines, and several days before the ER visit, abruptly threw away the drugs she had been using. Plaintiff reported that she began seeing a psychologist and a psychiatrist in early adolescence. During later years, she had infrequent psychiatric contact for symptoms of depression -- low moods, crying spells, poor concentration, and chronic suicidal ideation. She was treated with Remeron and Paxil, and over the years, engaged in "significant drug abuse," including alcohol use every day since age 12 until six years prior to the ER incident, continued use of marijuana every day, and past use of cocaine, LSD, mushrooms, mescaline, and methamphetamines. In addition, she abused prescription drugs. Since her abrupt cessation of drug abuse, she continued to experience significant anxiety and symptoms of depression. A history of assaultive behavior towards her husband was noted. Dr. Filippino wrote that it was "difficult to determine to what degree [Plaintiff's] mood problems have arisen from substance abuse," and that she would remain on Remeron and Paxil. Dr. Filippino's clinical impressions included borderline personality disorder and a GAF of 50. (Tr. 205-10.)

Psychiatric clinic progress notes showed that Plaintiff continued treatment with Dr. Filippino on a more-or-less monthly basis from October 2005 through June 2006. Throughout this period, Plaintiff's diagnosis included substance-induced mood disorder; opiate abuse rather than dependency; and possible borderline personality disorder and impulse control disorder. The notes also document continual problems between Plaintiff and her husband, and her anger toward him. Each progress note represented that Plaintiff

was cooperative and polite, with good eye contact and normal grooming.

More specifically, the notes from October 2005 stated that Plaintiff was in a "notably agitated state." She reported frequent outbursts of anger since her abrupt cessation of benzodiazepine and opiate abuse. She had already restarted Remeron and Paxil, with little improvement, and was now restarted on Valium, with warnings not to abuse it. She was also taking Klonopin. At her November 2005 visit to the clinic, she was in a much improved state, and her medications were continued. She had stopped taking Topamax on her own and was urged to see her neurologist. (Tr. 202-03).

In December 2005, Plaintiff reported that she was looking into a job as a cook at a fast food restaurant, work she had done in the past, but she also reported that she was afraid to go out. The therapist noted that Plaintiff appeared mildly manic. At the January 2006 session, Plaintiff reported resolution of most emerging manic symptoms, and the therapist noted that she had been stable for several months. She had run out of Klonopin and would not go back to her neurologist. Ambien was prescribed as a sleeping aid and Neurontin as a mood stabilizer. (Tr. 200-01.)

On January 29, 2006, Plaintiff presented to the ER with a painful ankle from trauma. She was diagnosed with left ankle soft tissue swelling without underlying bone or joint abnormality, and a left heel spur. She appeared alert, oriented, calm, and cooperative, and her speech was clear. (Tr. 211-15.) Her visits to the psychiatry clinic continued. In February 2006, Dr. Filippino noted that Plaintiff had run out of Paxil and

did not call for a refill.  At her visit to the clinic in April 2006,[3] Plaintiff was put back on

Paxil.  She reported in May 2006 that she was afraid to go out on her own, and her mood

was noted as "depressed."  (Tr. 194-210.)

An MRI of Plaintiff's ankle on June 12, 2006, showed severe tendinopathy and

near complete tear of the left posterior tibialis tendon.  (Tr. 222.)  At her June 2006 visit

to the psychiatry clinic,  Plaintiff reported that she had been very depressed lately, with

low energy, crying spells, and loss of concentration.  (Tr. 192-93.)

Psychiatrist Tony Thrasher, D.O., re-evaluated Plaintiff on August 2, 2006.  She

presented as an "[o]bese Caucasian female, very unkempt, wearing orthopedic cast and

boot on the left foot."  Dr. Thrasher's "multiaxial assessment"[4] was as follows: Axis I:

impulse control disorder, not otherwise specified; cannabis abuse; alcohol abuse; rule out

sedative hypnotic and anxiolytic dependence; amphetamine, opiate, and cocaine

dependence, full sustained remission.  Axis II: personality disorder, not otherwise

specified.  Axis III: history of seizure disorder, restless leg syndrome; hyperlipidemia;

orthopedic injury to left foot.  Axis IV: marital stressors.  Axis V: a GAF of 70.

---

[3]      No March visit is documented in the record.

[4]      DSM-IV-TR's multiaxial assessment system involves assessing mental
disorders on different axes, each of which refers to a different domain of information.
There are five axes: Axis I refers to the individual's clinical disorders, other than
personality disorders and mental retardation which are covered in Axis II; Axis III refers
to the individual's general medical condition; Axis IV to psychosocial and environmental
problems; and Axis V is the individual's GAF.

Dr. Thrasher noted that several of Plaintiff's substance abuse problems had dissipated, but that there was still enough residual symptomatology "to be most concerning for a personality disorder." He also noted that Plaintiff had carried other diagnoses in the past "concerning major depression and possible impulse control but they appear to be better accounted for by a simple Axis II condition, particularly a cluster B personality disorder most likely borderline or histrionic personality disorder." Plaintiff acknowledged that she still occasionally used alcohol and marijuana, and Dr. Thrasher thought that "the drug use in particular combined with the Axis II condition is probably the most appropriate diagnosis." He wrote that on mental examination, Plaintiff exhibited "extreme odd behavior"; she was very histrionic and dramatic and invaded his personal space several times. Her flow of thought was logical and sequential, she was not suicidal or homicidal, and she was able to care for herself. Dr. Thrasher wrote that Plaintiff was "doing well" on Paxil and Remeron with regard to her impulse control issues. (Tr. 185-90.)

On December 6, 2006, Dr. Thrasher noted that Plaintiff continued to use marijuana daily, and that he tapered her benzodiazepines since she was getting some from another doctor. (Tr. 178-79.)

On December 23, 2006, Plaintiff underwent a left calcaneal osteotomy and flexor digittorum tendon transfer. She was discharged from the hospital the next day. (Tr. 280).

Dr. Thrasher documented a February 5, 2007 telephone call between himself and Plaintiff, who had called him to complain about his decision to lower her Valium dosage

with her next refill.  Dr. Thrasher noted that Plaintiff was aware that he had planned to decrease her benzodiazepine usage throughout the year and had already begun to taper it with her consent.  He told Plaintiff that he was concerned that she had not informed him that she was receiving benzodiazepines from another doctor, too.  (Tr. 176).

Dr. Thrasher's progress notes from February 26, 2007, stated that Plaintiff "was much more withdrawn yet dramatic," which Dr. Thrasher found "not surprising" given that a pharmacy check showed increased benzodiazepines, Percocet, and Vicodin obtained through other doctors.   Plaintiff's diagnosis was cannabis dependence, alcohol abuse, amphetamine dependence, opiate dependence (prescribed pain pills), histrionic personality disorder, and a GAF of 60.  (Tr. 174-75.)

On March 29, 2007, Plaintiff was diagnosed with low back strain.  (Tr. 248-51.) She was seen at the hospital on May 5, 2007, and was noted to have had a seizure. Diagnostic tests showed left periorbital and forehead soft tissue swelling.  Chronic kidney disease was also noted.  (Tr. 264-75.)

State consulting psychologist Judith McGee, Ph.D., was asked to complete a Psychiatric Review Technique form based upon a review of Plaintiff's medical records. She wrote on June 21, 2007, that there was not enough evidence to determine what the severity of Plaintiff's impairments would be without Plaintiff's drug and alcohol abuse, and, thus, there was insufficient evidence to make a decision as to whether Plaintiff was disabled prior to September 30, 2006, the date Plaintiff was last insured for purposes of Social Security disability insurance benefits.  (Tr. 300).

**<u>Evidentiary Hearing of May 12, 2008</u> (Tr. 25-51)**

Plaintiff passed away prior to her hearing before the ALJ, and Plaintiff's husband ("Mr. Kamper") testified at the hearing as the substitute party. Upon questioning by Plaintiff's counsel, Mr. Kamper testified that he had been married to Plaintiff for nine years and one month. He stated that Plaintiff suffered from multiple seizures, depression, psychological issues, headaches and backaches. The last seizure he observed was in May 2006.

Mr. Kamper testified that Plaintiff told him that she was depressed, and he thought that the doctors she was seeing were for this problem. He acknowledged that he had never witnessed any crying spells. Mr. Kamper testified that Plaintiff was homicidal and had threatened him several times, but that he was not aware of her being delusional. Two or three times a week, she would not be able to sleep, and he would find her wide awake in the middle of the night sometimes eating, which she would not remember the next morning. In addition, Plaintiff had difficulty concentrating, and experienced debilitating headaches three or four times a week.

Mr. Kamper testified that the last few times that he took Plaintiff to the doctor before her death were for back pain. Plaintiff had continued to limp after her ripped tendon was repaired. She could not stand for longer than 15 to 20 minutes before having to sit down, nor sit for longer that 15 to 20 minutes before having to lie down. Mr. Kamper testified that since 2004, he and Plaintiff would go camping three times a year for a day or two. Plaintiff did not drive because she was afraid of having a seizure. She

could not bend or reach things on the floor.

Mr. Kamper testified that Plaintiff stopped going to church because she could no longer sit for the entire hour-and-a-half service, and she rarely socialized. Plaintiff had no problems with her personal care, was able to do laundry "a couple of times" a week, went grocery shopping with him on occasion, and had made (floral) centerpieces for two or three months.

Upon examination by the ALJ, Mr. Kamper testified that Plaintiff started having seizures in 2001 or 2002, and that she took Dilantin for seizures, Soma (a muscle relaxant) for her back spasms, and Remeron to help her sleep. Even with the Dilantin, she continued having seizures. He also thought that Plaintiff took Valium for depression. Mr. Kamper testified that Plaintiff had been seeing a psychiatrist until "a couple months" before she passed away.

Mr. Kamper testified that Plaintiff drank about six beers twice a week, and had been using marijuana since she was a teenager. He described several incidents in which she exhibited violence toward him including threatening him with a knife and trying to run him over. The ALJ noted that Plaintiff's insured status ended on September 30, 2006, and Mr. Kamper stated that Plaintiff had not been able to work for at least a year before that date. He testified that Plaintiff was let go from her last job after she had a seizure, because she could no longer drive.

The VE summarized Plaintiff's past work in terms of job title, skill level, and exertional level. The ALJ asked the VE whether there were jobs that an individual with

Plaintiff's vocational factors (age, education, work experience) who was limited to performing sedentary work that involved simple repetitive tasks and instructions, could perform. The VE testified that such an individual would not be able to perform Plaintiff's past relevant jobs, except perhaps the job of cashier at a sedentary level. The VE testified that such a person could also work at a wafer semi-conductor position (a bench job in which the worker "breaks semi-conductor wafers into individual dyes"), or a sedentary assembly fabricator position, and that all the jobs he mentioned existed in significant numbers locally and state-wide. The VE noted that the Dictionary of Occupational Titles ("DOT") assigned the last two jobs he identified as having a Specific Vocational Preparation ("SVP") level of 2 (indicating one month of training needed to learn the job).[5] The VE testified that if the individual had a GAF of 50, she would be unemployable.

**ALJ's Decision of July 3, 2008 (Tr. 13-18)**

The ALJ found that Mr. Kamper's testimony at the hearing generally supported Plaintiff's allegations, and that the SSA interviewer's observations that Plaintiff walked slowly and was stiff, lent some credibility to Plaintiff's claim of a limited lifestyle. However, the ALJ believed that the facts that Plaintiff cared for her pets, had no problems with personal care, and shopped indicated a greater ability to perform work-related

---

[5] The Court takes judicial notice of the fact that the DOT assigns an SVP level of 3 to the first job identified by the ALJ, that of sedentary cashier, indicating one to three months of training needed to learn the job.

activities than she alleged. The ALJ also found that Plaintiff's work history and low earnings detracted from the credibility of her allegations of work-related limitations, and that "[b]ased on the evidence as a whole," Plaintiff "was not fully credible" in her allegations about the severity of her work-related limitations.

The ALJ summarized Plaintiff's medical history, and found that her seizures, affective mood disorder, and polysubstance addiction disorders were "severe" impairments, as that term is defined in the Commissioner's regulations, but that her other alleged impairments (leg, back, and foot problems) were not "severe." The ALJ then found that Plaintiff's seizure disorder did not meet the requirements of a deemed-disabling impairment listed in the Commissioner's regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, but that, when her polysubstance addiction disorders were considered, Plaintiff's mental impairments did meet the requirements for a deemed-disabling impairment.

The ALJ concluded, however, that without considering Plaintiff's polysubstance addiction disorders, Plaintiff did not have a mental impairment of listing severity. More specifically, he found that when Plaintiff's substance abuse disorders were not considered, she had only mild limitation in activities of daily living and social functioning; moderate limitations of concentration, persistence or pace; and no episodes of decompensation that lasted for two weeks. In support of this conclusion, the ALJ pointed to the fact that when Plaintiff underwent psychiatric treatment, "examiners noted she had abused substances . . . , showing that her episodes of decompensation were

related to her substance abuse." The ALJ further relied on Plaintiff's representations that she had no problems with her personal care, went shopping, handled her finances, read books, spent time with others, and got along with authority figures. Furthermore, "during moments of relative sobriety, examiners observed that [Plaintiff] was alert, oriented, calm, and cooperative."

The ALJ determined that Plaintiff had the RFC to lift and carry no more than ten pounds occasionally and less than ten pounds frequently; sit for up to six hours in a workday; stand or walk for up to two hours each in a work day; and occasionally climb, balance, stoop, couch, kneel, and crawl. She could not climb ladders, ropes, or scaffolds, and had to avoid open moving machinery. In addition, she was limited to simple, repetitive tasks, due to her affective mood disorder.

The ALJ found that Plaintiff could not perform her past relevant work. He found, however, based upon the VE's testimony that an individual with Plaintiff's RFC and Plaintiff's vocational factors could work as a sedentary cashier, a bench worker, and an assembler, jobs which all existed in significant numbers in the local and national economy, that when Plaintiff's substance addiction disorders were not considered, Plaintiff was not disabled.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment

is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations, 20 C.F.R. part 404, Subpt. P, App. I. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors.

**Plaintiff's Substance Addiction Disorders**

Plaintiff argues that the ALJ did not follow the proper analysis in concluding that without considering Plaintiff's polysubstance addiction disorders, Plaintiff was not disabled. Plaintiff essentially argues that there is not substantial evidence in the record to support this conclusion. She points to Dr. McGee's June 2007 opinion that there was not enough evidence to determine what the severity of Plaintiff's impairments would have been without Plaintiff's drug and alcohol abuse. Plaintiff also relies upon the August 2005 ER diagnosis, including a GAF of 50, given at a time when Plaintiff was just using marijuana; and upon Dr. Thrasher's August 2006 observation that while Plaintiff's

substance abuse problems had dissipated, there was still enough residual symptomatology "to be most concerning for a personality disorder."

In 1996, the Social Security Act was amended to reflect changes in the award of benefits with respect to claimants suffering from a substance use disorder. The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Under the Commissioner's implementing regulations, 20 C.F.R. § 404.1535(b), the Commissioner must first determine whether the claimant is disabled

> without segregating out any effects that might be due to substance use disorders. . . . If the gross total of a claimant's limitations, including the effects of substance use disorders suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent.

Brueggeman v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2008) (citations omitted).

Here, the ALJ followed this procedure in arriving at the conclusion that without considering Plaintiff's polysubstance addiction disorders, Plaintiff was not disabled. The question remains as to whether substantial evidence supports this conclusion, or put another way, whether substantial evidence supports the ALJ's RFC assessment.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite

work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The Court believes that a close question is presented on this issue, but concludes that the ALJ's RFC assessment is supported by sufficient evidence. It is troubling to so hold in the face of the fact that Dr. McGee stated in June 2007 that there was not enough evidence to determine what the severity of Plaintiff's impairments would have been without Plaintiff's drug and alcohol abuse. But the record also contains Dr. Thrasher's August 2006 GAF assessment of 70, and February 2007 GAF of 60, both indicating an ability to work. See, e.g., Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2004). The

Court notes that the GAF of 50 was assessed in August 2005 when Plaintiff was in significant withdrawal from substance abuse, and such a low GAF is not seen again in the record.

**Hypothetical Question Posed to the VE**

Plaintiff argues that the VE's testimony was not reliable because it was in response to a hypothetical question that did not capture the concrete consequences of Plaintiff's impairments, that is, that included a faulty RFC. The discussion above resolves this argument in the Commissioner's favor.

**Jobs Identified by the VE**

Plaintiff argues that the jobs identified by the VE as ones a person with Plaintiff's RFC and vocational factors could perform were not limited to simple repetitive tasks, a limitation which was part of Plaintiff's RFC as assessed by the ALJ. This argument is without merit. Work with an SVP of 2 is unskilled work, Social Security Ruling 00-4p, 2000 WL 1898704, at *3, which is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," 20 C.F.R. § 416.968(a). A job with an SVP of 2 is not at odds with the restriction to simple repetitive tasks. See Stroda v. Astrue, No. C09-5112BHS, 2010 WL 129814, at *13 (W.D. Wash. Jan 11, 2010) (citing cases); Rochon v. Astrue, No. 09-CV-373H(POR), 2009 WL 4260258, at *6 (S.D. Cal., 2009); Flaherty v. Halter, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001).

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 23rd day of February, 2010.